Cite as 2025 Ark. App. 564

# ARKANSAS COURT OF APPEALS
## DIVISION I
### No. CV-23-739

| | |
|---|---|
| LEE KO | Opinion Delivered November 19, 2025 |
| APPELLANT | |
| | APPEAL FROM THE WASHINGTON COUNTY CIRCUIT COURT |
| V. | [NO. 72CV-19-641] |
| | |
| ESTHER WILLS | HONORABLE BETH STOREY BRYAN, JUDGE |
| APPELLEE | |
| | AFFIRMED |

## CINDY GRACE THYER, Judge

This appeal involves a judicial determination of the boundary line between the adjacent residential properties of appellant Lee Ko and appellee Esther Wills. Wills sought a judicial determination of the boundary line consistent with a survey that she obtained in 2015 in connection with the purchase of her property. Ko counterclaimed to quiet title in her consistent with a survey that she obtained in 2017 and asserted various other claims against Wills and Wills's husband, Levi Schroeder. All of Ko's counterclaims, except for her quiet-title claim, were dismissed at the summary-judgment stage. The boundary-line issue proceeded to a bench trial, after which the circuit court determined that the correct boundary is that delineated on the survey that Wills obtained in 2015.

Ko appeals pro se, raising five points for reversal: (1) the circuit court erred in granting summary judgment and dismissing Ko's original counterclaim for "malicious oppression";

(2) the circuit court erred in granting Wills's motion for summary judgment and in dismissing Ko's fourth amended counterclaim for clouding of title, trespass, and slander of title; (3) the circuit court erred in denying Ko's motions for summary judgment on the boundary-line issue and Ko's fourth amended counterclaim; (4) the circuit court's findings of fact relating to its boundary-line determination are clearly erroneous; and (5) the circuit court erred by denying Ko's recusal motion. We affirm.

## I. *Background*

The primary dispute in this matter concerns the correct boundary between Lots 8 and 9 of Elams Subdivision in Fayetteville. Ko owns Lots 7 and 8 with a street address of 319 S. Washington Avenue. Wills owns Lot 9 and part of Lot 10 with a street address of 321 S. Washington Avenue.

Ko purchased her property in 1994. At the time of that purchase, there was a single shared driveway used by the occupants of 319 and the neighbor to the south at 321. There was also an old existing chain-link fence segment running from a "found" pin to the back of an existing shed. According to Ko, this was part of the chain-link fencing that had previously enclosed her backyard. Ko lived in her house at 319 S. Washington for approximately a year before she moved out of state. She moved back to Little Rock in 2006 and, from there, oversaw a remodel of her Fayetteville house. In 2008, she moved out of state again and did not return until November 2017. She rented out the property at 319 S. Washington when she was not living there.

Wills purchased her property at 321 S. Washington on July 2, 2015.[1] In conjunction with that closing, she obtained a survey of the property completed by Blew and Associates dated June 30, 2015 (the "Blew survey"). The Blew survey shows the line between Wills's north boundary and Ko's south boundary running east from an existing "found" pin, bisecting both an existing shed and gravel driveway between 319 and 321 to the right-of-way of S. Washington Avenue. The title in Wills's vesting deed and survey was insured by Stewart Title. Wills believed, consistent with the Blew survey and insured title, that her property at 321 included a shared driveway and shed that straddled the property line. Accordingly, Wills and Schroeder used the shed at the end of the shared driveway to store equipment for Schroeder's lawn business and other "handyman's items" throughout much of 2016. They shared use of the shed with Ko's then-renter Eric Walker. They installed doors to lock the shed and gave Walker a key for access.

In the summer of 2016, Wills emailed Ko, who was living in California at the time, to discuss taking the shed down because it had deteriorated. Wills offered to cover the cost of the teardown. Ko did not want the shed torn down. Ko asked Walker, her tenant, "to take some pictures of the shed in case the neighbors proceeded with the demolition and to warn any contractors who show up to demolish the garage that the owner did not give permission." The photographs that Walker took and sent back to Ko in 2016 plainly show the doors that

---

[1]Wills was unmarried at the time she purchased the property. She later married Schroeder, and they have lived together at the property ever since.

Wills and Schroeder installed on the shed as well as the lawn equipment and "handyman's items" they stored inside the shed.

On January 2, 2017, Wills sent an email with the subject line "Unsafe Shed on S. Washington Street" to the Code Compliance Office of the City of Fayetteville. Wills wrote:

> I want to learn more about what goes into reporting an unsafe shed/building on our street. We share a driveway with our neighbors and part of their shed (3.5 feet) sits on our property. The owner of the house lives in California. We let her know about the condition of the shed and how dangerous it is. We asked if she would please consider tearing it down before winter. She refused.
>
> We do not want to start an argument with the owner or the tenants in the house, but feel the shed is a huge hazard. One wall is solely being held up by particle board.
>
> What can we do? If we officially report the shed, will she know the complaint came from us? Like we said, we don't want her to be upset with us, but we are looking out for the children and animals in the neighborhood. We are worried it might fall on someone!
>
> Please advise us on what to do next.

The city inspected the shed the following day. The city's records note: "Shed that straddles property line. Southern half has been removed, remaining half is dilapidated and unsafe." On January 23, the city sent a notification "Re: Property Nuisance at 319 S. Washington Avenue" to Ko via certified mail. The notification letter states that the "primary item of concern is the dilapidated garage structure at the end of the shared driveway." The city found the shed to be in "a very poor state of disrepair and deterioration," noting "large areas of buckled, rotted wood siding and fascia, rotten and termite-damaged framing members, and numerous locations for weather and vermin to infiltrate the structure." The

4

city advised that the shed should either be repaired or torn down to avoid a possible "public nuisance" determination.

According to the city's records, on January 27, City Employee Matthew Cabe "[m]et with owner's brother (owner resides in CA) regarding structure and discussed options regarding replacement and/or removal of this structure and potential implications." On January 31, Mr. Cabe "[g]ave deadline of February 28, 2017 for owner to tell us solution for garage . . . to provide enough time for City Council consideration of split garage construction." A February 23, 2017 note indicates that a "[m]eeting [was] scheduled with Mr. Ko on 02/24/2017 to discuss options with BD & PL." A note dated May 26, 2017, states, "Garage structure has been removed. SR resolved."

The city's "property nuisance" notification prompted Ko to have her property surveyed to determine the boundary in February 2017. Ko, thereafter, admittedly decided to have the shed torn down.

Ko's survey was completed by Alan Reid and Associates and dated February 14, 2017 (the "Reid survey"). The Reid survey draws the boundary line between Lot 8 (Ko's property) and Lot 9 (Wills's property) running east from a pin that Alan Reid set while conducting his survey. Reid set this pin 9.4 feet south of the existing "found" pin marking the back corner on Lots 8 and 9 on the Blew survey. The boundary drawn on the Reid survey places the existing shed and shared driveway completely on Ko's property and includes on Ko's property a portion of Wills's house; particularly, a mudroom side entrance to the residence.

In 2018, Ko recorded the Reid survey in the Washington County real estate records. Additionally, Ko demanded that Wills and Schroeder stop using the long-shared driveway and later voiced her intent to install a privacy fence consistent with the boundary as drawn on the Reid survey. These circumstances led to the action from which this appeal arises. Wills initially filed a complaint naming her title insurance company and others as defendants.[2] She later amended her complaint to add a claim seeking judicial determination of the boundary line and added Ko as a party defendant. Wills's complaint sought a determination by the court that (1) the Blew Survey is a true and correct survey of the boundary between Wills's property and Ko's property; or alternatively, (2) the boundary shown on the Blew Survey has been acknowledged by Wills and her predecessors in title and by Ko and her predecessors in title and occupancy and has ripened into a boundary by acquiescence under Arkansas law.

Ko filed an answer and original two-count counterclaim on May 27, 2020. In count I, Ko sought to quiet title in her consistent with the boundary on the Reid survey. In count II, she asserted a claim titled "Counterclaim Defendants' Malicious Oppression of Ko." In support of her "malicious oppression" claim, Ko alleged that Wills and Schroeder stored

---

[2]The original complaint was filed on March 19, 2019. The original defendants were Stewart Title Guaranty Company; Realty Title and Escrow Services, Inc., d/b/a Prime Title and Escrow Company; and Blew and Associates, P.A. Wills voluntarily dismissed her claims against Blew in October 2019. She ultimately settled with Stewart Title and Prime Title relating to the failure to defend, and her claims against those defendants were dismissed shortly before the bench trial in July 2023.

6

"their valuables behind doors and lock in my garage shed at least till the end of October 2016." According to Ko, soon after returning from their wedding, Wills and Schroeder "began a plot to use the City of Fayetteville as the tool to destroy my garage." Ko alleged that they "took down the doors and lock, removed their belongings and staged the premise" before contacting the city about the shed in early January 2017. Additionally, Ko asserted that certain allegations in Wills's complaint constituted "lies and defamation." She also asserted that Wills's family's "malicious actions" by walking through a portion of the shared driveway "created a very intimidating environment for [her]."

Wills moved for partial summary judgment, seeking dismissal of Ko's counterclaim for "malicious oppression" because the "material allegations on which Ms. Ko attempts to rest any claim for monetary damages as to the Plaintiff and her husband Mr. Schroeder, simply fail to state a cognizable claim under Arkansas law." With her motion, Wills submitted the affidavits of herself and Schroeder and accompanying exhibits: (1) the Blew survey; (2) June–July 2016 emails between Wills and Ko about the shed; (3) Wills's January 2017 emails with city employees regarding the shed; and (4) City of Fayetteville Service Request Detail records.

Ko responded and submitted (1) a reproduction of text messages sent between Ko's tenant and Schroeder from October 2016 and February 2017; (2) the same June–July 2016 emails that Wills submitted with her motion; and (3) a document identifying certain of Wills's answers to Ko's counterclaim and responses to Ko's requests for admission. In her response, Ko denied that she had "requested relief for legal defamation" but asserted,

7

without explanation, "that the fact that Ms. Wills willfully and knowingly made these false statements in her pleadings is material." She also denied "that Wills and Schroeder's conduct are not outrageous" and stated her belief that "Wills and Schroeder perjured themselves in [their] affidavits."

The circuit court heard the summary-judgment motion on January 7, 2022. Ko clarified at the hearing that her perjury allegation related to Wills's statements that she felt the shed was unsafe, which Ko contended was supported by evidence that Wills and Schroeder stored items in the shed until at least October 2016. The circuit court ruled from the bench as follows:

> So, again, as I stated earlier, I've read the Motion for Summary Judgment as well as the response and the reply. Again, Ms. Ko . . . I'm not trying to be critical of you at all. I've just – because you're not a licensed attorney in Arkansas there are things that you may not know, but the law requires that I hold you to the same standard as an attorney. When a Motion for Summary Judgment is filed, as Mr. Parker pointed out, the meeting proof with proof, . . . that's a term that you'll find in hundreds, maybe thousands of . . . Arkansas Court of Appeals and Arkansas Supreme Court decisions – when there's an affidavit, then that's the proof. I understand you say it's self-serving. But . . . sworn testimony either in an affidavit or deposition form is what you would attach to a summary judgment and then there would have to be sworn testimony and the response.

> The . . . crux of Mr. Parker's argument is that your Count II certainly refers to facts and allegations involving the shed and alleged conduct of the plaintiffs, but there's no real cause of action stated that's actionable in Arkansas as it relates to that. It sort of hints around at maybe tort of outrage or hints around at defamation. But, in any event, the allegations that have been made in the Counterclaim do not rise to the level of either of those causes of action. So, based on that, the Court will grant summary judgment on the Counterclaim that you've alleged thus far. So, I'll grant the motion on those issues.

. . . .

> And I want to make clear the main part of your Counterclaim relates to the boundary, what's the boundary. That's still an issue in this case. This was just . . . the Count II which, again, was difficult to ascertain what you were even getting at based on how it's pled, the summary judgment motion is granted.

On January 14, 2022, the court entered a written order dismissing with prejudice Ko's "malicious oppression" counterclaim.

On September 6, 2022, Ko filed a fourth amended counterclaim, asserting claims for quiet title, clouding of title, trespass, and slander of title. Ko's fourth amended counterclaim largely asserted the same allegations as her original counterclaim.

Ko thereafter moved for summary judgment on the boundary-line issue and on each of her counterclaims. Following a January 11, 2023 hearing, the circuit court denied Ko's motions for summary judgment in an order entered on February 22, 2023.

Wills subsequently moved for summary judgment, seeking dismissal of Ko's counterclaims for clouding of title, trespass, and slander of title. The circuit court entered an order granting Wills's summary-judgment motions and dismissing Ko's counterclaims for clouding of title, trespass, and slander of title on July 3, 2023.

On July 11, 2023, a bench trial was held on Wills's claim and Ko's counterclaim relating to the true boundary line between the adjacent properties. Having determined "that all other Claims and Counterclaims have been disposed of by voluntary action of the Parties and/or prior Order of the Court[,]" the circuit court entered its final judgment resolving the boundary-line issue on July 27, 2023. On the basis of the testimony and exhibits introduced

in the bench trial, and "having the opportunity to personally observe the witness[es] as they testified, watch their body language, their demeanor and listen to the tone of their voice and having the opportunity to judge the consistency or inconsistency of the testimony and having come to conclusions concerning the credibility of the witnesses through personal observation," the court made the following findings of fact and conclusions of law.

FINDINGS OF FACT:

1. The Defendant Lee Ko ("Ko") resides in a residence at 319 S. Washington Avenue in Fayetteville, Arkansas, which she jointly acquired with her father and brother in June of 1994.

2. Ko is currently the sole owner of the property after her father and brother quitclaimed their interests to her.

3. The legal description of Ko's property is Lots 7 and 8 Elams Addition to the City of Fayetteville.

4. The adjacent property to the South of Ko's residence, namely the property at 321 S. Washington, had been occupied by renters for some considerable time before and after 1994. It was purchased in July of 2015 by Esther Wills ("Wills"). Wills was unmarried at the time of the purchase. She has subsequently married Levi Schroeder. After Wills and Schroeder had remodeled the property, they moved into 321, and it has been their residence ever since.

5. Wills' vesting deed reads as follows:

Lot 9 and part of Lot 10, Elams Subdivision, Fayetteville, Washington County, Arkansas, described as beginning at a found iron pin being the Northwest corner of Lot 9 and running thence South 87 degrees 04 minutes 06 seconds East 142.65 feet, thence South 05 degrees 06 minutes 18 seconds West 55.27 feet to a found iron pin, thence North 86 degrees 01 minute 42 seconds West 141.53 feet, thence North 03 degrees 58 minutes 18 seconds East 52.67 feet to the Point of Beginning, subject to easements and right of ways of record, if any.

10

6. There is a gravel driveway between the residences at 319 and 321 S. Washington. At the time of Ko's original purchase of 319 in 1994, and thereafter, the driveway has been jointly used by the occupants of both 319 and 321.

7. It is not clear when such joint use began, but it was prior to 1994.

8. Ms. Ko moved back to Arkansas and into her house at 319 S. Washington in 2017. The driveway continued to be jointly used by the Plaintiff and Defendant for a time. Sometime after Ko secured a survey, Ko began asserting her claim that the driveway was solely on her property, [and] Ko began parking her car in a location that frustrated joint use.

9. There had been a chain link fence that was in existence at the time Ko and her family first purchased an interest in the property at 319. The fence ran east and west from a half inch rebar to a garage/shed at the end of the joint driveway. This fence stopped where it intersected with the back wall of a then existing garage/shed, almost at the middle of the back wall of that outbuilding. A photograph of that fence was introduced as an Exhibit. Sometime in 2017 the garage/shed was removed.

10. Prior to Wills purchasing her home in the summer of 2015, and despite having waived any survey requirement with her mortgage company and her real estate agent, Wills decided in fact to secure a survey and hired a Fayetteville firm Blew and Associates to prepare a survey of the property Wills was purchasing.

11. Heath Myers ("Myers"), an employee of Blew and Associates in the summer of 2015, was the project manager on the engagement for Wills. Although Myers was not then a licensed surveyor in the State of Arkansas in 2015, Myers did research and helped develop the survey. He did this work under the direction of Buckley Blew whose license number and stamp is on the Survey. Blew and Myers directed other employees who did site work. Myers had worked in this industry since 2004.

12. Myers became a licensed professional surveyor in December 2016.

13. There is a dispute in the testimony as to whether the Blew survey was undertaken and completed in accordance with Arkansas rules regarding surveyors, but the survey was supervised by and signed off by Blew, a registered professional surveyor.

14. Myers testified extensively about the "Blew" survey. That survey shows a "found" half inch rebar as the northwest corner of the Wills property and a "found" half inch rebar at the southeast corner. Blew and Associates employees set a survey pin at the southwest corner of [the] Wills property, and no pin was set at the intersection of the shared gravel drive and Washington Avenue. The chain link fence discussed in Finding of Fact No. 9 began at the "found" rebar shown as the northwest corner of Wills' ownership on the Blew survey.

15. In February 2017, before Ko moved back to Arkansas in November 2017, Ko hired Alan Reid, a long-time experienced surveyor in Fayetteville, to survey her property.

16. The "Reid" survey and the previously discussed "Blew" survey differ as to the location and call of the northern property line of the Wills property and the southern property line of the Ko property. Copies of both Surveys were placed in evidence and extensively discussed in the testimony.

17. The Reid survey identifies the "found" rebar which the Blew survey concluded was the northwest corner of the Wills property, but the Reid survey showed the "true" corner as being 9.4 feet south of that rebar where Reid placed his own survey pin. The Reid survey showed that the boundary line between the Wills and Ko property was situated such that all of the previously shared drive was on the Ko property.

18. The Reid survey also located the previously discussed segment of chain link fence that ran from the "found" rebar to the back of the then existing garage/shed, although with the placement of Reid's pin signifying his corner, Reid located that fence, the shed, as well as the historically shared driveway well within Ko's property. In fact, Reid placed the boundary such that the property line ran through a portion of Wills' house, namely a mudroom on the north side of the residence at 321 which had been added sometime after that original house had been built.

19. Both Wills and Ko's property are described with reference to lots in Elams Addition to the City of Fayetteville, the plat of which was filed for record on February 14, 1928.

20. The original Plat for Elams Addition states on its face that it is a Replat that includes three blocks in the earlier platted Combs Addition to the City of Fayetteville.

21. A certified copy of an earlier Plat (stating on its face that it is a copy of the original plat filed for record on August 8, 1893) shows both the Combs Addition and the Boles Addition located just north of that portion of the Combs Addition later replatted as Elams Addition. This plat was introduced into evidence.

22. The 1928 Plat of Elams identifies that the subdivision's west boundary is College Avenue, and its east boundary is Washington Avenue. The plat does not identify the north or south boundary of Elams Addition.

23. The north boundary of what became Elams Addition is shown on the Boles/Combs Plat discussed in Finding of Fact No. 21 as an unnamed city street segment. The Plat does not identify a right of way width for this street segment, although a north [and] south street segment in the Boles Addition that dead ends into this street shows a 20 foot right of way.

24. Pages from the Fayetteville City Atlas for 1957, 1963, and 1976 were introduced as Exhibits. These documents came from books retained by Blew and Associates because they were useful guides to determine the width of historic rights of way for Fayetteville city streets. These pages indicated a 20 foot right of way for the street in question that is now named South Street and was the northern boundary of Elams Addition and the southern boundary of Boles Addition.

25. Reid agreed in testimony with Myers that at the time Elams Addition was platted, East South Street had a 20 foot right of way.

26. Myers testified that Reid's survey was predicated on an existing pin being the northeast corner of Lot 1, Block 1 Elams Addition. The placement of that pin is consistent with the current 30 foot right of way and not the historic 20 foot right of way. This fact is shown on a filed survey done by Bates and Associates which was introduced into evidence. Myers opined that this is the difference between the Blew and Reid surveys.

27. Mr. Reid denied that his survey is predicated on a 30 foot right of way for East South Street.

13

28. The Court finds that the credible evidence as a whole establishes that the Blew survey shows the correct boundary line.

29. In making the factual finding, the Court puts weight on the photographs introduced by both parties and proof regarding the existence of the chain link fence segment running from the found rebar to the back of the old garage/shed.

CONCLUSIONS OF LAW:

1. The correct boundary between Lot 8 Elams Addition (which is the southern boundary of the Ko property) and Lot 9 Elams Addition (which is the northern boundary of the Wills property) is that shown on the Blew Survey, which is attached to this Judgment for clarification.

2. In the alternative, the Court also finds that the chain link fence that ran between the "found" rebar and the back of the then existing garage/shed establishes a boundary by acquiescence that had apparently been established prior to 1994. A boundary by acquiescence in this location running to Washington Avenue is also entirely consistent with the longstanding practice that the driveway (which straddles the boundary in this location) was used by both the occupants of 319 and the occupants of 321.

3. The owners of Lot 8 and the owners of Lot 9, their successors and assigns, therefore each hold a prescriptive easement running with the land to utilize this driveway in the location shown on the Blew survey for vehicle and pedestrian access and egress to Washington Avenue.

Ko now appeals.

II. *Summary Judgment*

On appeal, we decide if the grant of summary judgment was appropriate by determining only whether the evidence left a material question of fact unanswered. *City of Bethel Heights v. Gregory A. Kendrick Revocable Living Tr.*, 2017 Ark. App. 78, at 3–4, 515 S.W.3d 135, 137–38. The burden of sustaining a motion for summary judgment is on the movant. *Id.* at 4, 515 S.W.3d at 138. The court views all proof submitted in the light most

14

favorable to the party resisting the motion, resolving any doubts and inferences against the moving party. *Id.*

Once the moving party has established a prima facie entitlement to summary judgment by affidavits or other supporting documents, the opposing party must meet proof with proof and demonstrate the existence of a material issue of fact. *Id.* This requires "the respondent [to] remove the cloak of formal allegations and demonstrate a genuine issue as to a material fact by affidavits setting forth facts which would be admissible in evidence." *Hughey v. Bennett*, 264 Ark. 64, 67, 568 S.W.2d 46, 49 (1978). Conclusory statements are not sufficient. *Miskimins v. The City Nat'l Bank of Fort Smith*, 248 Ark. 1194, 1205, 456 S.W.2d 673, 679 (1970). "Self-serving statements regarding a [party's] state of mind or her subjective beliefs are no more than conclusions and are not, therefore, competent summary-judgment evidence." *Flentje v. First Nat'l Bank of Wynne*, 340 Ark. 563, 574–75, 11 S.W.3d 531, 539 (2000); *see also Little Rock Elec. Contractors, Inc. v. Entergy Corp.*, 79 Ark. App. 337, 342, 87 S.W.3d 842, 845–46 (2002).

"[T]he purpose of summary judgment is to avoid the waste of time, work, and money involved in requiring the trial of a case when a party cannot produce evidence supporting the existence of a fact necessary to establish his claim or defense." *Hamilton v. Allen*, 100 Ark. App. 240, 244 n.1, 267 S.W.3d 627, 631 n.1 (2007). Accordingly, when a party cannot present proof of an essential element of a claim, the party moving for summary judgment is entitled to judgment as a matter of law. *Wilson v. Gillentine*, 2021 Ark. App. 46, at 3, 618 S.W.3d 145, 147.

## A. Malicious Oppression

The circuit court summarily dismissed Ko's original counterclaim asserting "malicious oppression," finding that while the claim "sort of hints around at maybe" the tort of outrage or defamation, the factual allegations asserted "do not rise to the level of either of those causes of action." We agree. Further, and contrary to Ko's argument, the evidence that Ko submitted in opposition to summary judgment does not support a reasonable inference of falsity in Wills's statements about the shed's condition, especially given that, upon inspection, the city found the shed to be "dilapidated and unsafe," after which Ko admittedly decided to have it torn down. *See Watkins v. Ark. Dep't of Agric.*, 2018 Ark. App. 460, at 11, 560 S.W.3d 814, 823 (reciting essential elements of defamation: (1) the defamatory nature of the statement of fact; (2) the statement's identification of or reference to the plaintiff; (3) publication of the statement by the defendant; (4) the defendant's fault in the publication; (5) the statement's falsity; and (6) damages). Ko's subjective belief about Wills's statements and actions, "without a supporting affidavit or other form of proof, is insufficient to support a *reasonable* inference" of falsity. *Flentje*, 340 Ark. at 574, 11 S.W.3d at 539. The tort of outrage, moreover, "requires extreme and outrageous behavior not to be tolerated in a civilized society[.]" *McAdams v. Curnayn*, 96 Ark. App. 118, 126, 239 S.W.3d 17, 22 (2006). "Merely describing conduct as outrageous" is not enough to survive summary judgment. *Givens v. Hixson*, 275 Ark. 370, 372, 631 S.W.2d 263, 264 (1982). Accordingly, the circuit court properly granted summary judgment as to Ko's original counterclaim for "malicious oppression."

## B. Clouding of Title

An essential element of Ko's counterclaim asserting that the filing of Wills's deed in 2015 allegedly clouded her title to her property as the boundary as drawn on the Reid survey requires proof that Wills put the "clouding" deed in the public record in 2015 "with knowledge of the instrument's lack of authenticity or genuineness." Ark. Code Ann. § 5-37-226(a) (Repl. 2024). Wills denied that she had such knowledge by sworn testimony in her affidavit. The evidence, moreover, shows that there was no reason for Wills to know in July 2015 that, almost two years later, Reid would produce a survey that put the authenticity of her own title in question. In 2015, Wills's predecessor in title gave her a warranty deed conveying title to her, and that title was insured by Stewart Title. The existing "found" pin—the chain-link fence running from that pin and bisecting the shed—and the long-shared driveway are consistent with the deed given to Wills in 2015. Further, according to Ko, she had the Reid survey undertaken in 2017 because she herself was unsure where the boundary line was. The circuit court therefore properly granted summary judgment as to Ko's counterclaim for clouding of title.

## C. Trespass

The circuit court summarily dismissed Ko's counterclaim for trespass as barred by the three-year statute of limitations. *See* Ark. Code Ann. § 16-56-105(4) (Repl. 2005) (all actions for trespass on lands shall be brought within three years after the cause of action accrues). Ko argued that her trespass claim related back to allegations in her original counterclaim filed on May 27, 2020. But as the circuit court noted, Ko had the shed torn down before

17

May 26, 2017, the date on which the city noted that the shed had been removed upon its last inspection. Thus, even Ko's original counterclaim was filed more than three years after any trespass relating to the shed could have occurred.

The statute of limitations "begins to run when there is a complete and present cause of action, and, in the absence of concealment of the wrong, when the injury occurs, not when it is discovered." *Cason v. Lambert*, 2015 Ark. App. 213, at 3, 462 S.W.3d 681, 683. Ko had the burden to prove by a preponderance of the evidence that the statute of limitations was, in fact, tolled. *Adams v. Arthur*, 333 Ark. 53, 63, 969 S.W.2d 598, 602–03 (1998). "Fraud suspends the running of the statute of limitations, and the suspension remains in effect until the party having the cause of action discovers the fraud or should have discovered it by the exercise of reasonable diligence." *Id.*, 969 S.W.3d at 603. But to toll the statute of limitations, there must be evidence creating a factual question related to "some positive act of fraud, something so furtively planned and secretly executed as to keep the plaintiff's cause of action concealed, or perpetrated in a way that it conceals itself." *Martin v. Arthur*, 339 Ark. 149, 154–55, 3 S.W.3d 684, 687 (1999) (quoting *Adams*, 333 Ark. at 68, 969 S.W.2d at 605). "Although the question of fraudulent concealment is normally a question of fact that is not suited for summary judgment, when the evidence leaves no room for a reasonable difference of opinion, a trial court may resolve fact issues as a matter of law." *Adams*, 333 Ark. at 63, 969 S.W.2d at 603.

The evidence does not support Ko's claim that Wills and Schroeder fraudulently concealed their use of the shed, which Ko allegedly only discovered in 2019. There is simply

no evidence of any attempt by Wills or Schroeder to conceal the fact that they used the shed. They openly shared use of the shed with Ko's renters at 319 S. Washington. Ko's tenant, Eric Walker, even sent photos to Ko (at Ko's request) in 2016 that plainly show the doors that Wills and Schroeder installed on the shed as well as Schroeder's lawn equipment and "handyman's items" being stored in the shed. Because "the evidence leaves no room for a reasonable difference of opinion," we hold that the circuit court properly rejected Ko's claim of fraudulent concealment as a matter of law. *Meadors v. Still*, 344 Ark. 307, 312, 40 S.W.3d 294, 298 (2001).

### D. Slander of Title

The circuit court summarily dismissed Ko's counterclaim for slander of title because Ko failed to submit proof that Wills "acted without a good faith belief that her communications to the City in January of 2017 were true or accurate" or that Wills "acted with malice or that she gave false information." An action for slander of title "is based on malicious publication of a false matter that disparages the title to property." *Belk v. Belk*, 2015 Ark. App. 682, at 4, 476 S.W.3d 861, 863 (quoting *Fleming v. Cox Law Firm*, 363 Ark. 17, 20, 210 S.W.3d 866, 868 (2005)). As discussed previously with respect to "malicious oppression," Ko simply cannot show that Wills's statements were false, much less that Wills acted with malice, given the city's determination that the shed was, in fact, "dilapidated and unsafe" and given that Ko herself opted to have the shed removed.

19

## E. Denial of Summary Judgment

We do not consider Ko's challenges to the denial of summary judgment. With certain exceptions not applicable here, the denial of a motion for summary judgment is not reviewable or appealable. *C&R Constr. Co., Inc. v. Woods Masonry & Repair, LLC*, 2020 Ark. App. 105, at 12, 596 S.W.3d 35, 43. The circuit court's February 22, 2023 order denying Ko's summary-judgment motions did not make any final judgment with respect to any of the claims or counterclaims but determined only that material facts remained in dispute. *See Cannady v. St. Vincent Infirmary Med. Ctr.*, 2018 Ark. 35, at 12, 537 S.W.3d 259, 266. Accordingly, the court's rulings would not prevent the presentation of any defense at trial. *See id.* Further, as previously discussed, Ko's counterclaims were the subject of a subsequent round of summary-judgment proceedings on the same, albeit more fully developed, record and were dismissed in the circuit court's July 3, 2023 order granting Wills's summary-judgment motions, from which Ko also appeals. When, like here, review of the earlier denied motions is not necessary to sustain the motions that were later granted, an appeal is not proper. *See Cannady*, 2018 Ark. 35, at 11, 537 S.W.3d at 266. Finally, the remaining claim and counterclaim relating to the boundary-line determination, as we will discuss next, were resolved after a bench trial by entry of the court's final judgment on July 27, 2023, from which Ko also appeals.

## III. *Boundary Line*

Boundary-line cases are reviewed de novo. *Waggoner v. Alford*, 2021 Ark. App. 120, at 5, 619 S.W.3d 59, 62. This court will not reverse findings of fact unless they are clearly

erroneous. *Id.* A finding is clearly erroneous when, although there is evidence to support it, we are left with the definite and firm conviction that a mistake has been made. *Id.* In reviewing a circuit court's findings of fact, we give due deference to the circuit court's superior position to determine the credibility of the witnesses and the weight to be accorded the testimony. *Chiodini v. Lock*, 2024 Ark. App. 505, at 6, 700 S.W.3d 483, 487. Because the location of a boundary is a disputed question of fact, we will affirm the circuit court's finding unless it is clearly against the preponderance of the evidence. *Waggoner*, 2021 Ark. App. 120, at 5, 619 S.W.3d at 62–63.

After the July 11, 2023 bench trial, the circuit court determined that the true boundary between Lot 8 (Ko's property) and Lot 9 (Wills's property) ran to the east from a "found" pin on the back property line of both lots, roughly along an existing chain-link fence segment to bisect the then-existing shed and then bisecting the long-shared gravel driveway to the right-of-way of Washington Avenue. This boundary is consistent with the Blew survey. The Reid survey, on the other hand, shows the back corner on Lots 8 and 9 not at the existing pin but at a pin Reid set in 2017 that is 9.4 feet south of the existing pin. The existing "found" pin is shown on both surveys. The Reid survey draws a boundary that places all of the shed and all of the long-shared driveway completely on Ko's property and includes on Ko's property a portion of Wills's mudroom.

The historical documents introduced at trial show that South Street, which is the northern boundary for Elams Subdivision, had a 20-foot right-of-way when Elams was platted in 1928. A survey completed in 2016 by Bates and Associates and filed of record in 2017

showing the north end of Elams and the paved and undeveloped right-of-way of South Street also was introduced at trial. The Bates survey shows that by 2016, South Street had a master street plan right-of-way of 30 feet, running from the northern edge of the existing pavement constituting South Street to include about 9 feet of undeveloped right-of-way, including property south of an existing fence. Reid testified that a pin shown on the Bates survey as consistent with a 30-foot right-of-way is the same pin he used as the northeast corner of Elams when he completed his survey for Ko in 2017. Reid agreed, however, that the historic right-of-way of South Street was only 20 feet. Yet the Reid survey nevertheless shifts all of Elams nearly 10 feet to the south.

We agree, as the circuit court found, that the Blew survey is more consistent with the history of constructed boundaries and longstanding property usage. The chain-link fence that ran from the existing pin to bisect the shed is consistent with that being an established corner. Even Ko considered that fence segment to be part of her enclosed backyard. The Reid survey, moreover, ignores an additional existing pin and an existing fence along Ko's northern boundary. If the two existing pins noted on the Reid survey, rather than the pins that Reid set in 2017, are considered the back corners of Ko's ownership (Lots 7 and 8), the existing pins seem to form two parallel boundaries along existing fence segments. Additionally, on the southern boundary of Wills's property there is an existing fence in 2015 that is completely thrown off if the subdivision lines are shifted almost 10 feet south, which the Reid survey would do. The Blew survey's boundary line misses Wills's mudroom; the Reid survey's does not. The Blew survey bisects the gravel driveway consistent with the long

22

history of shared use. The Reid survey does not; in fact, it leaves Wills's property as it was in 2017 with no driveway at all.

To the extent that Ko challenges the circuit court's recognition that the owners of the adjacent properties "each hold a prescriptive easement running with the land to utilize this driveway in the location shown on the Blew survey for vehicle and pedestrian access and egress to Washington Avenue," she did not assert any argument challenging the prescriptive easement below. We are therefore precluded from considering the issue on appeal. *See, e.g., Sutton v. Falci*, 2024 Ark. App. 46, at 6–7, 683 S.W.3d 593, 597 (reciting well-settled rule that failure to raise argument before the circuit court precludes review on appeal). In any event, open and continuous use of the driveway by the occupants of both 319 and 321 S. Washington was undisputed. Ko herself alleged that such usage had been ongoing since at least 1994. Otherwise, Ko simply disagrees with the circuit court's assessment and characterization of the evidence. "However, it is the circuit court's function in a bench trial to determine the facts. While it may not craft facts out of whole cloth, it may make reasonable inferences from the evidence presented." *Chiodini*, 2024 Ark. App. 505, at 6, 700 S.W.3d at 487. After our de novo review of this record, we are not left with a firm conviction that the circuit court committed reversible error.

IV. *Recusal*

In her final point on appeal, Ko argues that the circuit court was biased against her and should have recused itself. We review a circuit court's denial of a motion to recuse under an abuse-of-discretion standard. *Chiodini*, 2024 Ark. App. 505, at 4, 700 S.W.3d at 486. The

decision to recuse is within the circuit court's discretion, and it will not be reversed absent abuse. *Id*. Judges are presumed to be impartial, and the party seeking disqualification bears the burden of proving otherwise. *Id*. To decide whether there has been an abuse of discretion, we review the record to see if prejudice or bias was exhibited. *Id*. Absent some objective demonstration by the appellant of the circuit judge's prejudice, it is the communication of bias by the judge that will cause us to reverse the judge's refusal to recuse himself or herself. *Id*. The fact that the circuit court ruled against the appellant is not sufficient to demonstrate bias. *Spurlock v. Est. of Ladd*, 2023 Ark. App. 253, at 9, 669 S.W.3d 214, 221.

As proof of bias, Ko cites the circuit court's "devastating mistreatment" of her by ordering mediation and scheduling a trial, which she contends impaired her ability to secure counsel. She also complains about the court's handling of certain discovery motions. Additionally, she argues that disqualification was required because the court "had been in close contact" with Wills's counsel regarding postmediation settlement negotiations with separate defendants Stewart Title and Prime Title before trial and did not inform Ko. Relatedly, she argues that the circuit court's decision that Wills's settlement with the separate defendants was not a basis to continue the trial on the issue of the boundary line is further evidence of the court's bias. She also contends that Wills's attorney knew that she "was *not* an indispensable party" but brought her into the lawsuit anyway. According to Ko, these actions result in "the unavoidable conclusion" that the only reason Ko "was dragged into this case is because the trial court wants to help Wills prevail, thus is fundamentally biased." We disagree.

24

Contrary to her argument, Ko was able to, and did, secure counsel on multiple occasions. The circuit court's December 15, 2021 scheduling order initially scheduled a bench trial to be held on April 20–21, 2022. That scheduling order and Ko's objection thereto is part of Ko's "devastating mistreatment" claim. Ko argued that the phrase in the order "after consultation with all parties" is "completely false" because in a November 30, 2021 hearing, she "objected strongly and did not agree to any trial date" and "knew nothing about mediation." Ko subsequently filed multiple continuance requests and objections relating to trial dates and court-ordered mediation, citing difficulty "finding a serious attorney."

In a March 1, 2022 letter, the circuit court wrote to Ko:

I received your letter dated February 25, 2022, today. Please let any potential attorney you hire know that the Court will likely continue the case to accommodate his/her trial schedule. However, I am unable to remove the trial date and mediation date while you look for an attorney. Once you have retained one or found one you would like to retain, the attorney will need to reach out to counsel for all parties and the Court to inquire about a new date, if needed.

On March 17, counsel entered an appearance on behalf of Ko. On April 7, Ko's counsel filed a motion to continue the April 20–21 trial date. The court granted the requested continuance and rescheduled the trial for July 13–14, 2022. On May 10, Ko's counsel moved to withdraw at Ko's request. On June 6, new counsel entered an appearance on behalf of Ko and immediately requested a ninety-day continuance of the then-scheduled trial date of July 13–14. Again, the court granted the requested continuance, and again, Ko

discharged counsel, requiring counsel to withdraw. Ko thereafter proceeded pro se for the bulk of the proceedings in the circuit court.[3]

On February 27, 2023, the circuit court entered an order scheduling the trial to commence on July 11, 2023, and ordering the parties "to conduct a mediation before Jason Wales at least thirty days prior to trial." The court further stated:

> The Court notes that this matter has been continued in the past, including to allow for parties to retain or change attorneys. As a result, this trial date will not be continued due to any reason within the control of the parties, including any request to add or change attorneys. Any attorney who may wish to join this case must be able to appear for the trial date as scheduled by this Order.

Ten days later, Ko filed her motion for recusal, which was denied on May 25, 2023.

Ko alleges no specific conduct by the circuit court that is indicative of bias, and our review of the record found none. The "mere fact of adverse rulings is not enough to demonstrate bias." *Watkins*, 2018 Ark. App. 460, at 19, 560 S.W.3d at 826–27 (quoting *Irvin v. State*, 345 Ark. 541, 550, 49 S.W.3d 635, 641 (2001)). Accordingly, we cannot say that the circuit court abused its discretion in denying Ko's motion to recuse.

Affirmed.

---

[3]On July 18, 2023, new counsel entered an appearance on behalf of Ko. Ko's counsel filed the August 11, 2023 notice of appeal and moved to withdraw on August 30, 2023. On October 25, 2023, another new counsel entered an appearance on behalf of Ko. Ko's new counsel lodged the record in this appeal and moved for an extension of brief time three times. On February 6, 2024, this court granted a final extension to March 17, 2024. Ko then discharged counsel, requiring counsel to move to withdraw on March 7, 2024. This court granted the motion to withdraw on April 3, 2024, and Ko filed her pro se appellant's brief on April 17, 2024.

BARRETT and WOOD, JJ., agree.

*Lee Ko*, pro se appellant.

*Eichenbaum Liles & Honaker Law*, by: *Christopher O. Parker*, for appellee.